IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| COX, DEWAYNE JACKSON (a/k/a Dwayne Cox),<br>    Plaintiff<br><br>v.<br><br>CAPT. KELLER;<br>SGT. SMITH;<br>MAJ. WINSTON;<br>LT. SHELTON;<br>CORRECTIONAL OFFICER MYLES (A/K/A MILES);<br>CORRECTIONAL OFFICER QUINN;<br>CORRECTIONAL OFFICER PINKERMAN;<br>CORRECTIONAL OFFICER BAXLEY;<br>OTHER UNKNOWN OFFICERS AND/OR EMPLOYEES<br>  OF THE WESTERN VIRGINIA REGIONAL JAIL;<br>and<br>REDDIX, BRANDON JAMAL,<br><br>    Defendants. | Case No.  7-12-cv-154 |

## COMPLAINT

Dewayne Jackson Cox, by counsel, moves for judgment against defendants Capt. Keller; Sgt. Smith; Maj. Winston; Lt. Shelton; Correctional Officers Myles (a/k/a Miles), Quinn, Pinkerman, and Baxley; other unknown officers and/or employees of the Western Virginia Regional Jail (collectively, the "Jail defendants"), in their individual capacities, and Brandon Jamal Reddix, and as grounds therefore states as follows:

### INTRODUCTION AND SUMMARY OF BASIS FOR THE COMPLAINT

1.    While an inmate at the Western Virginia Regional Jail ("WVRJ" or the "Jail") in April 2011 Dewayne Jackson Cox was attacked and severely beaten by another inmate, defendant Brandon Jamal Reddix, who was part of a gang that harassed, terrorized and bullied the inmates in the pod where Cox was housed.

2. Prior to the beating Cox and other inmates in the pod had complained to several of the Jail defendants, in writing and orally, about the gang of inmates, to include that they were fearful for their safety. All Jail defendants had knowledge of one or more of these complaints.

3. Despite these prior complaints, no action was taken by the Jail defendants to protect Cox and the other inmates from the serious threat of harm from the inmate gang.

4. As a result of the deliberate indifference by the Jail defendants to this substantial threat of serious harm one of the gang members attacked Cox and severely beat and injured him.

5. Cox demands that these Jail defendants be held accountable for failing to take action to prevent this harm from occurring to him, which could have been prevented by the simple act of moving this gang of inmates to another pod at the jail, or moving Cox to another pod.

6. Cox also demands that Brandon Jamal Reddix be held accountable for his acts of assault and battery against him.

## JURISDICTION AND VENUE

7. This is an action to address deprivation of rights under color of law, statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to plaintiff by the Eighth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983, and arising under the laws and statutes of the Commonwealth of Virginia, including but not limited to Article I, Section 9 of the Constitution of the Commonwealth of Virginia, and various torts arising under state law.

8. The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343. Cox requests that the Court exercise supplemental jurisdiction over the state law claims.

9. Venue is proper in the Western District of Virginia under 28 U.S.C. §1391 in that

all of the acts complained of occurred in the Western District of Virginia.

## PARTIES

10. Dewayne Jackson Cox is a small-to-medium build, 47-year-old, Caucasian male, a citizen of the United States and resident of the Commonwealth of Virginia.

11. At all times relevant to this action the Jail defendants were officers, and/or employees of the WVRJ, located 5885 West River Road, Salem, Virginia 24153, where the acts complained of herein took place. The Jail defendants are named in their individual capacities.

12. Defendant Brandon Jamal Reddix is a 23-year-old, African-American male, who at all times relevant to this action was an inmate in Pod 3A at the WVRJ.

## FACTUAL ALLEGATIONS

### I. KNOWLEDGE OF THE JAIL DEFENDANTS PRIOR TO THE ATTACK.

13. Dewayne Cox was a post-conviction inmate at the WVRJ in early 2011. During the time period relevant to this action the WVRJ assigned Cox to Pod 3A.

14. During the course of his stay in Pod 3A other inmates were transferred into the pod.

15. Among the inmates moved into Pod 3A was Jackson, an African-American male, and Cabell, also an African-American male.

16. Jackson and Cabell became acquainted with another inmate already in Pod 3A named Harris, also an African-American male.

17. Upon information and belief, the Jail defendants knew that Harris, Cabell and/or Jackson had a history of illegal and disruptive behavior at the WVRJ and/or other correctional facilities before being moved into Pod 3A, to include confrontations with other inmates and/or correctional officers.

18. Jackson, Cabell and Harris became an informal gang in the pod (hereinafter the "inmate gang").

19. Harris was the ringleader of the gang.

20. The inmate gang made references to themselves as being members of known street gangs, such as the Crips.

21. Cabell and Harris are physically large and muscular individuals, intimidating by their very size and presence.

22. Most, if not all, of the other inmates in Pod 3A were Caucasian, all were of slighter build than Harris and Cabell, and several were much older than Jackson, Harris and Cabell.

23. The inmate gang began to demand control of all aspects of Pod 3A that were left to inmate discretion. This included matters like control of the television remote control in the common area of the pod and access and control of all seating in the common area. While sounding trivial, this behavior disrupted the accepted norms in the pod concerning these matters.

24. The inmate gang also stole and forcibly took property from other inmates, such as food stuffs that inmates purchased from the Jail commissary.

25. The inmate gang would threaten and assault other inmates if the inmates appeared to challenge or "disrespect" them in any manner.

26. The other inmates in Pod 3A were fearful of the inmate gang.

27. The inmate gang exercised control over the pod for several weeks in March 2011, and became increasingly bold in their ill-treatment of and threats to other inmates.

28. Cox, being fearful for his own safety and that of other inmates, complained to Jail officials about the situation by submitting a "blue slip".

29. A "blue slip" is the form used by inmates to officially advise the Jail administration of complaints, needs and/or other information.

30. Cox submitted his blue slip to defendant Winston in late March or early April 2011.

31. In response to the blue slip, defendant Keller called Cox out of the pod and spoke to him in the Jail library.

32. Cox explained the situation to Keller, to include that he was fearful for his safety, and asked either to be moved to another pod or to have the inmate gang moved to another pod. Specifically Cox told Keller, "Somebody is going to get hurt if something is not done."

33. After speaking with Keller, Cox returned to Pod 3A.

34. At this time, defendant Keller also spoke to another inmate from Pod 3A who complained similarly about the inmate gang.

35. A short time after Cox returned to the pod, Jackson re-entered the pod, walked toward Cox and stated, "You're the f***ing snitch! … Keller told me you wrote the letter!"

36. Over the next few days Jackson and Harris repeatedly told Cox, "we gonna get you, snitch … we got people to get you," or words to that effect.

37. After this Cox became even more concerned for his safety, but the Jail defendants took no action: Cox was not moved to another pod, nor was the inmate gang moved.

38. The inmate gang continued harassing, terrorizing and bullying the other inmates in the pod. Among other behaviors, they would repeatedly challenge the other inmates to do anything to upset them and see what consequences they would suffer.

39. On one occasion Cabell threw a chair across the common area and yelled, "Say somethin' mother-f***ers, come on somebody say somethin'!" or words to that effect,

challenging the other inmates to confront his bullying behavior.

40. About this time another African-American inmate, defendant Brandon Jamal Reddix, was moved into Pod 3A. Reddix became part of the inmate gang.

41. Like Harris and Cabell, Reddix was physically large and muscular individual, intimidating by his very size and presence.

42. On or about April 10, 2011, the other inmates in Pod 3A agreed among themselves that they would all submit blue slips advising Jail administration of the situation with the inmate gang.

43. Upon information and belief, several inmates in Pod 3A submitted blue slips on or about April 10, 2011, complaining about the inmate gang and expressing fear for their safety,

44. The next day, April 11, 2011, defendants Myles (a/k/a Miles) and Quinn called Cox and another inmate from the pod and spoke to them in the hallway outside of Pod 3A, while the members of the inmate gang were at recreation in another portion of the Jail.

45. Upon information and belief, the Jail defendants knew the risk to complaining inmates if they were identified as "snitches": this is why Myles and Quinn spoke to Cox and the other inmate while the inmate gang was at recreation.

46. Myles asked Cox and the other inmate what was the status of the current situation with the inmate gang.

47. While talking to Cox and the other inmate, Myles requested that Correctional Officers Pinkerman and Baxley join him and Quinn in the hallway to listen to what Cox and the other inmate were telling them.

48. Cox and the other inmate reiterated the complaints that Cox has expressed to Keller, and advised these Jail defendants of the statements made by Jackson (set forth at ¶¶ 35

and 39, above) after Keller had revealed to Jackson that Cox made a complaint.

49. Cox and the other inmate expressed concern for their safety and stated that the inmate gang had become emboldened because nothing had happened after Cox's initial complaint.

50. During this time a third inmate from Pod 3A also was present in the hallway. This third inmate reiterated and confirmed the complaints of Cox and the other inmate to defendants Myles, Quinn, Pinkerman and Baxley.

51. Cox and the other inmate specifically requested to be moved to another pod or that the Jail defendants move the inmate gang to another pod.

52. Myles said that he would talk to the inmate gang, but Cox and the other inmate said that would only make matters worse.

53. One of the Jail defendants said he was "not sure what they should do about it, maybe we should tell the Sergeant?"

54. Upon information and belief one or more of these defendants did notify defendant Sgt. Smith of Cox's and the other inmate's complaints, but defendant Smith, who is African-American, took no action.

55. Ultimately, these Jail defendants simply said that they would "take care of it."

56. After speaking to these Jail defendants Cox and the other inmate returned to Pod 3A.

57. Not long after that the inmate gang returned to the pod, and soon thereafter Harris was called from the pod.

58. About this time dinner was being served in the pod. In the course of serving dinner the inmates come into the common area of the pod, take trays from carts brought into the

pod and usually sit at tables in the common area to eat.

59. While dinner was being served Harris returned to the pod. He immediately began to point at Cox and other inmates, and said, "You can't do nothin' to Sheron! These people in here can't do nothin' with me! I already attacked a guard!"[1]

60. After Harris returned Cabell was called out of the pod.

61. Harris sat down in the common area next to an inmate named Joe. While talking to Harris, Joe began to point at Cox.

62. Cox became very fearful for his safety and, therefore, he left the common area before finishing his dinner and went to his cell, which was located on the second floor of the pod.

63. Cabell then returned to the pod, and he and Harris began saying loudly, "$50 to whoever tells us who the snitch is!" and "Oh, Dewayne is the snitch!"

64. After a time the conversation went quiet, and Cox exited his cell to see what was going on.

65. As Cox stood on the second floor walkway, Cabell climbed the stairs to where Cox was standing and said to Cox, "What did you tell the police? … The C.O.'s tell me you talked to them. … You're a snitch … You're gonna get f***ed up before shift change."

II. THE ATTACK.

66. Next, Reddix climbed the stairs, walked up to Cox and said, "Let's go into your cell and talk."

67. Cox refused and Reddix pushed Cox into the cell.

68. As Reddix pushed Cox into the cell, Cox turned toward Reddix and Reddix punched him in the face.

---

[1] Harris' full name is Sheron Maurice Harris.

69. The punch knocked Cox to the floor.

70. Reddix then began punching Cox repeatedly about the head, face and torso. Cox remembers being hit repeatedly in the back and left side of the head, and in his side and ribs.

71. Cox tried to crawl underneath his bunk to get away from Reddix.

72. Reddix kept punching Cox.

73. After what seemed like forever, Cox heard someone yell "Police!" and the beating stopped.

74. Cox was bleeding and the floor of his cell was streaked with blood.

75. Reddix exited Cox's cell and someone shut the door to Cox's cell. Once the door was shut Cox could not open the door – it locked automatically, and no means existed for Cox to alert or summon officers to his aid.

76. Officers eventually discovered Cox in a badly beaten state and immediately took him to the medical unit.

77. Two of the officers who removed Cox from the pod were Myles and either Baxley or Quinn. Cox told them they should have gotten him out of the pod; the officers apologized to him.

78. After this, Jail officials finally removed the inmate gang from Pod 3A.

79. Pod 3A is subject to video surveillance that is supposed to be monitored by one or more unknown Jail defendants.

80. Upon information and belief, had these unknown Jail defendants been monitoring the surveillance monitors then they would have known that the circumstances in Pod 3A had escalated to the point that inmate-on-inmate violence was imminent, and/or would have known that Reddix was attacking Cox and could have acted to prevent and/or stop the attack. Therefore,

these Jail defendants either failed to adequately monitor the surveillance monitors, or intentionally failed to take action to prevent Cox from being beaten.

### III. THE JAIL DEFENDANTS' POST-ATTACK RETALIATORY ACTS.

81. While in the medical unit defendant Smith came to speak to Cox as part of an investigation into the attack. During the course of his interview of Cox, Smith said that "Harris had been causing him trouble all over the jail."

82. Smith took photographs of Cox to record his injuries.

83. Later medical personnel X-rayed Cox, which X-rays revealed one or more broken ribs. Additionally, Cox was badly bruised, had several lacerations and was in significant pain.

84. Medical personnel at the Jail prescribed Lortab to Cox for his pain: Lortab is a strong narcotic pain reliever rarely prescribed in the jail setting.

85. After the attack, Cox filed several grievances and blue slips complaining that defendants should have moved him to another pod, moved the inmate gang to another pod or taken some action to protect him from the attack that he suffered, and asked to be compensated for his injuries.

86. At one point defendant Smith came to speak to Cox about his grievances and blue slips. During this conversation Smith admitted that it was his decision on April 11, 2011 whether to do anything in response to the complaints from Pod 3A. Smith further admitted that he had decided to take no action and that he stood by that decision: he said that he made no mistake.

87. After that Smith told Cox not to file any more blue slips, and that there was nothing the jail was going to do for him.

88. Jail defendants Keller, Smith and Shelton denied Cox's grievances and blue slips

and refused to award him any consideration as a result of defendants' failure to prevent the attack on him. Defendant Keller actually laughed at Cox when he said that he wanted compensation for his injuries.

89. After Cox filed blue slips and grievances about the attack, and after Cox's counsel advised the WVRJ to preserve all video surveillance and other relevant documents concerning the matter, one or more Jail defendants (and/or other WVRJ officers or employees) began to retaliate against Cox, to include (but not limited to) placing him in segregation on fabricated disciplinary charges, confronting him in an aggressive and intimidating manner and accusing him of inciting the attack, and charging him exorbitant prices for medication prescribed to him by medical personnel to treat his injuries from the attack.

90. Also, after the attack one or more Jail defendants placed defendant Reddix and one or more of the other inmate gang members back in Pod 3A, where they threatened known witnesses of the attack on Cox if they cooperated in the institutional investigation, in the criminal proceeding against Reddix in Roanoke County General District Court and/or in any other formal proceedings.

91. Upon information and belief, at least one reason why the defendants took no action to prevent the attack from occurring was because at the time of the attack the Jail was in the middle of, or preparing for an accreditation inspection by the American Corrections Academy ("ACA"): the WVRJ did not want ACA to be aware of the incident, especially if it was deemed gang-related.

92. As a direct and proximately result of the defendants' actions and inactions Cox was caused to suffer and continues to suffer serious and permanent injuries and has suffered and will suffer in the future inconvenience of pain of body and mind, has been and will be in the

future deprived of earnings, has been and will be in the future prevented from transacting his business and household duties, and has incurred and will continue to incur medical and related expenses in an effort to treat or cure said injuries and the consequences thereof.

93. Further, as a direct and proximately result of the defendants' actions and inactions Cox was caused to suffer and continues to suffer severe emotional distress in the form of nightmares, fear in the institutional setting in being around other inmates, stress, suicidal thoughts/ideations and depression.

94. Cox did not cause or contribute to the circumstances that led to his beating, nor did he assume the risk of injury.

95. Cox has not failed to mitigate his damages.

### COUNT I
### CLAIM FOR RELIEF UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES AND 42 U.S.C. §1983 AND ARTICLE I, §9 OF THE CONSTITUTION OF VIRGINIA.

96. Cox incorporates by reference herein the preceding allegations in this Complaint.

97. The Eighth Amendment to the Constitution of the United States and Article I, §9 of the Constitution of Virginia provide that inmates should not be subjected to cruel and unusual punishment.

98. In a correctional facility inmates, like Cox, are stripped of virtually all means of self-protection and aid, except for the aid of Jail officials.

99. The Jail defendants owed a duty to Cox to protect him from known risks to his life and safety.

100. The Jail defendants knew of, but intentionally ignored and disregarded the complaints of Cox and other inmates in Pod 3A.

101. The Jail defendants failed to protect Cox despite their actual knowledge of a

serious and imminent risk to Cox.

102. The Jail defendants were deliberately indifferent to a serious risk of harm to Cox.

103. As a result of the Jail defendants' deliberate indifference Cox was severely beaten and suffered serious injuries.

104. Further, by revealing to the inmate gang the identities of the inmates who had complained about them the Jail defendants contributed to and enhanced the risk of harm to Cox.

105. The Jail defendants' actions after the attack were in retaliation for Cox's complaints about the attack and his announced intent to take action to enforce his rights.

106. The acts of the Jail defendants and each of them constitute cruel and unusual punishment of Cox in violation of Eighth Amendment to the Constitution of the United States and Article I, Section 9 of the Commonwealth of Virginia, and other applicable laws of the United States and the Commonwealth of Virginia.

107. The acts of defendants and each of them constitute a denial of due process and a failure to ensure the safety and well-being of Cox in violation of Eighth and Fourteenth Amendments to the Constitution of the United States, and a denial of Cox's liberty interest under the Fourteenth Amendment to the Constitution of the United States.

108. Cox has suffered and continues to suffer harm and damages as a result of acts set forth herein.

109. The Jail defendants are not entitled to qualified immunity.

110. Further, the Jail defendants acted intentionally and willfully and/or with reckless disregard of the rights of Cox so as to support an award of punitive damages.

## COUNT II
### CLAIM FOR CONSPIRACY TO VIOLATE PLAINTIFF'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES AND 42 U.S.C. §1983

111. Cox incorporates by reference herein the preceding allegations in this Complaint.

112. The Jail defendants conspired to deprive Cox from the protection due him under the Constitution of the United States.

113. As a result of this conspiracy and the deliberate indifference of the Jail defendants, Cox was severely beaten and suffered serious injuries.

114. Cox has suffered and continues to suffer harm and damages as a result of acts set forth herein.

115. After the attack the Jail defendants' conspired to retaliate against for his complaints about the attack and his announced intent to take action to enforce his rights.

116. The acts of the Jail defendants and each of them constitute cruel and unusual punishment of Cox in violation of Eighth Amendment to the Constitution of the United States and Article I, Section 9 of the Commonwealth of Virginia, and other applicable laws of the United States and the Commonwealth of Virginia.

117. The acts of defendants and each of them constitute a denial of due process and a failure to ensure the safety and well-being of Cox in violation of Eighth and Fourteenth Amendments to the Constitution of the United States, and a denial of Cox's liberty interest under the Fourteenth Amendment to the Constitution of the United States.

118. The Jail defendants are not entitled to qualified immunity.

119. Further, the Jail defendants acted intentionally and willfully and/or with reckless disregard of the rights of Cox so as to support an award of punitive damages.

## COUNT III
## CLAIM FOR ASSAULT AND BATTERY

120. Cox incorporates by reference herein the preceding allegations in this Complaint.

121. Brandon Jamal Reddix assaulted and battered Cox without any lawful justification.

122. As a result of Reddix's assault and battery Cox has suffered and continues to suffer serious and permanent injuries.

123. Further, Reddix acted intentionally and willfully and/or with reckless disregard of the rights of Cox so as to support an award of punitive damages.

## COUNT IV
## CLAIM FOR AIDING AND ABETTING AND CONSPIRACY
## TO COMMIT ASSAULT AND BATTERY

124. Cox incorporates by reference herein the preceding allegations in this Complaint.

125. The Jail defendants knew or should have known that a substantial risk to Cox's life, health and safety existed, to include serious, likely and imminent risk that one or more members of the inmate gang were going to attack and assault and batter Cox.

126. Despite this knowledge, the Jail defendants aided and abetted Reddix by taking no action and permitting Reddix continued access to Cox by allowing the inmate gang to remain in Pod 3A, and necessarily allowed the circumstances to continue to exist that permitted Reddix to assault and battery of Cox.

127. Such action and inaction by the Jail defendants constitutes aiding and abetting assault and a battery, and a conspiracy among all defendants to permit and commit assault and battery.

128. As a result of this aiding and abetting by the Jail defendants, and conspiracy between all defendants, Cox was severely beaten and suffered serious injuries.

129. Cox has suffered and continues to suffer harm and damages as a result of acts set forth herein.

130. Further, all defendants acted intentionally and willfully and/or with reckless disregard of the rights of Cox so as to support an award of punitive damages.

## COUNT V
## CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

131. Cox incorporates by reference herein the preceding allegations in this Complaint.

132. The conduct of all defendants constitutes intentional infliction of emotional distress: the conduct was intentional or reckless; the conduct was outrageous and intolerable; Cox suffered severe emotional distress including but not limited to nightmares, fear in the institutional setting in being around other inmates, stress, suicidal thoughts/ideations and depression; the wrongful conduct and Cox's emotional distress are causally related; and the emotional distress is and will continued to be severe.

133. As a direct and proximate result of defendants' actions, defendants are liable to plaintiff for compensatory and punitive damages as further alleged herein.

134. Further, all defendants acted intentionally and willfully and/or with reckless disregard of the rights of Cox so as to support an award of punitive damages.

## CONCLUSION

WHEREFORE, Dewayne Jackson Cox demands judgment against defendants, jointly and severally, in an amount to be determined at trial of this matter for compensatory and punitive damages; for an award of attorney's fees and costs, including expert fees; and for all other relief to which he may be entitled.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,
DEWAYNE JACKSON COX

*/s/ Melvin E. Williams*
Of Counsel

Melvin E. Williams (VSB No. 43305)
GRIMES & WILLIAMS, P.C.
320 Elm Avenue, SW
Roanoke, Virginia 24016-4001
(540) 982-3711
(540) 345-6572 *facsimile*
    Counsel for Dewayne Jackson Cox