CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 03 2015

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DEWAYNE JACKSON COX                )
                                   )    Civil Action No. 7:12CV00154
         Plaintiff,                )
                                   )    **MEMORANDUM OPINION**
v.                                 )
                                   )    Hon. Glen E. Conrad
CAPTAIN CHAD KELLER, et al.,       )    Chief United States District Judge
                                   )
         Defendants.               )

On April 11, 2011, while incarcerated at the Western Virginia Regional Jail in Salem,

Virginia, Dewayne Jackson Cox was assaulted by a fellow inmate. Cox subsequently filed this

action against Captain Chad Keller, Sergeant Willie Smith, Major Greg Winston, Officer Bradley

Quinn, Officer Joshua Pinkerman, Officer Benjamin Baxley, and Justin Miles, asserting claims

under 42 U.S.C. § 1983 and Virginia law. The case is presently before the court on the

defendants' motions for summary judgment.[1] For the reasons set forth below, the motions will be

granted in part and denied in part.

## Factual Background

The following facts are either undisputed, or where disputed, are presented in the light

most favorable to Cox. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Cox, a fifty-year-old Caucasian man, was incarcerated at the Western Virginia Regional

Jail for approximately fourteen months, beginning in June of 2010, after being convicted of a

---

[1] The first motion for summary judgment (Docket No. 28) was filed by Justin Miles. Miles, who was
working as an uncertified correctional officer during the time period at issue, is no longer employed by the jail.
The second motion for summary judgment (Docket No. 31) was filed by Captain Keller, Sergeant Smith, Major
Winston, Officer Quinn, Officer Pinkerman, and Officer Baxley, all of whom are still employed by the jail (the
"jail defendants").

felony offense in state court. For the majority of his term of incarceration, Cox was housed in Pod 3A with 52 other male inmates. Cox resided in Cell 18 on the second tier of Pod 3A.

Cox's fellow inmates in Pod 3A included a "clique" of younger African-American inmates. Miles Dep. Tr. 40. The leader of the clique was Sheron Harris. Other members included David Cabell, Terrence Jackson, and, at a later time, the assailant, Brandon Reddix. See id. at 40 (describing Harris, Cabell, Jackson, and Reddix as "a little clique" that "always hung out together").

Cox and other inmates in the pod considered Harris, Cabell, and Jackson to be aggressive, loud, and intimidating. See Cox Dep. Tr. 33; see also Rutherford Decl. 2 ("Harris[,] Cabell[,] and Jackson [were] constantly loud and intimidating and more or less [were] in a gang all their own."). For instance, Harris, Cabell, and Jackson "made threatening remarks . . . if they could not control the [television] and the newspaper when it came into the pod," and they "would snatch the TV remote from others['] hands, and take radios or unplug headphones . . . ." Garlic Decl. 1-2; see also Rutherford Decl. 2 ("The took the newspaper from other inmates, [and] they took the remote and changed TV channels when they wanted even though we had designated days to clean up the pod . . . in order to have a TV day to make it fair for everyone.").

On March 8, 2011, Major Greg Winston gave Captain Chad Keller an anonymous "blue slip" that had been submitted by an inmate, which indicated that Harris was causing problems in the pod.[2] Major Winston directed Captain Keller to investigate the matter. Captain Keller subsequently met with Harris and several other inmates, including Cox, individually. Cox admitted to authoring the blue slip, and advised Captain Keller that Harris was harassing him and other inmates in the pod, and that he was "having things taken." Cox Dep. Tr. 125. Cox asked to

---

[2] According to the record, a "blue slip" is a form that inmates use to make requests or voice complaints. See Cox Dep. Tr. 36.

2

either be moved from Pod 3A, or to have Harris moved from the pod. According to Cox, Captain Keller responded as follows:

> [H]e said, "How about if I keep Sheron [Harris] on a chain and keep him locked down? I know Sheron is loud, I know he is an asshole. I have had him everywhere in this jail. He creates problems everywhere he goes is the reason we put him in this particular program. If I keep him on a chain, can I keep you all in the pod together if I talk to Sheron?"

Cox Dep. Tr. 125. In response, Cox said, "Sure, if it will keep the trouble down, go right ahead." Id.

After Captain Keller "got on [Harris] for the way he was acting," Harris's behavior worsened and he began to threaten Cox. Id. at 115. He called Cox a "snitch" and a "piece of shit," and indicated that he "was going to get" Cox. Id. at 114-115, 126.

A few weeks after Cox's meeting with Captain Keller, an incident occurred while Cox was playing poker with a group of inmates, including Harris and Cabell. When Cox won a hand, Harris and Cabell yelled and cursed at him. Cabell then reached across the table, knocked the cards out of Cox's hands, and said, "Do something punk, say anything you old toothless son of a bitch and I'll stomp your white ass all over this pod." Rutherford Decl. at 2-3. Cabell then threw a chair across the floor and issued a challenge to the entire pod: "Anybody say one fucking word about it I will fuck em up. Go on, anybody, please say something so I can beat some ass." Id. at 3. Cabell subsequently took several cans of soup from Cox, which Cox had won during the poker game, and told Cox that "he better get them 20 more soups by commissary day or else they'd beat his ass." Id.

Cox maintains that he submitted several blue slips over the two to three week period leading up to the April 11, 2011 incident. Cox testified that he indicated that he "was being

3

threatened and robbed and that [he] wanted to be moved from the pod or [the other inmates] to be moved." Cox Dep. Tr. 37.

On April 11, 2011, Officer Bradley Quinn, Officer Benjamin Baxley, and Justin Miles were on duty in Pod 3A. When Miles entered the pod that morning around 9:00 or 9:30, Cox approached him and asked him "what they were going to do about what was going on in the pod." Cox Dep. Tr. 61. Cox also asked Miles "how many blue slips they had received concerning what was going on [in] the pod with Cabell and Jackson and Harris." Id. In response, Miles indicated that "they had received a blue slip from [Cox] and another inmate, Christopher Harding . . . ." Id.

At Miles' request, Cox walked out in the hallway with Miles to talk about what was going on in the pod. Cox was accompanied by another inmate, Jerry Garlic. Cox and Garlic advised Miles that they were being threatened, that Cabell and Harris had been stealing commissary items, and that they were afraid that they were going to be harmed. Id. at 62, 64; Garlic Decl. 2. Cox "requested that either they be moved or [he] be moved," and "Garlic requested the same thing." Cox Dep. Tr. 62; Garlic Decl. 2.

Before Miles had the opportunity to respond, Officer Quinn appeared, and Miles asked Cox to repeat what Cox had just told him. While Cox was talking to Officer Quinn, Officer Baxley also approached from the control room. Cox "told them all the same thing." Id. at 63. Before Cox was finished speaking, Officer Joshua Pinkerman approached and was informed of the situation. Miles advised Cox that Harris, Cabell, and Jackson "were going to rec," and that he and the other officers "would handle it." Id. at 64. In response, Cox inquired as to how they were going to handle the situation, and emphasized that "somebody needs to be moved" or "somebody is going to get hurt." Id.; see also id. at 123 ("I did tell them that I wanted to be moved from the pod. I was being robbed and was afraid that something bad was going to happen behind it.").

4

Miles and the correctional officers directed Cox to return to his cell, and told him that the officers would talk to the other inmates when they returned from the recreation area. In response, Cox said, "Don't do that because that will put an X on me and make the situation worse than what it is." Id. at 65. Cox reiterated that he would like for the officers to move him or the other inmates, and Garlic made the same request. Id.; see also Garlic Decl. 2 ("We asked C/Os Miles, Baxley, Quinn, and Pinkerman to help us by removing those four inmates, or removing us from the pod because we felt like we were going to end up getting jumped on and beat[en] up by these men or end up hurt by them.").

After speaking with Cox and Garlic, the officers discussed the matter with a supervisor, Sergeant Willie Smith. Miles called Sergeant Smith over the radio, and advised him that there was an issue in Pod 3A and that he needed to know what Smith wanted the officers to do. Sergeant Smith's exact response is in dispute. Miles testified that Sergeant Smith "was pretty busy at the moment," and that Smith advised him to have the certified correctional officers with whom he was working handle the situation. Miles Dep. Tr. 45. Sergeant Smith testified that he advised the officers that "if Cox is being threatened in any way or if anybody is being threatened, remove them out of the pod, lock the inmates down, lock the whole pod and question all of the inmates in the pod to find out what [is] going on." Smith Dep. Tr. 88.

The parties also dispute whether Cox was given the opportunity to move to another pod. Miles testified that either Officer Quinn or Officer Baxley offered to move Cox to another pod on the morning of April 11, 2011, but Cox "refused to leave." Miles Dep. Tr. 82, 85. Cox, on the other hand, testified that he "told them that [he] wanted to be moved," and that the officers instead sent him and Garlic back into the pod. Cox Dep. Tr. 65; see also Garlic Decl. 2 ("Dewayne and I talked to the four C/Os for at least five to ten minutes trying to explain the problems and asking for

5

their help in protecting us from them. C/O Miles told us to return to our pod and that they would talk to those inmates concerning these problems once they returned from recreation.").

When Cox returned to the pod, he called his girlfriend on the pod's telephone. While Cox was talking to his girlfriend, inmates began to return from the recreation area. Cox noticed that Harris, Cabell, and Jackson did not come back to the pod with the rest of the inmates, but instead returned five or six minutes later. As soon as Harris, Cabell, and Jackson entered the pod, Harris yelled, "You are a fucking snitch and we are going to get your ass." Cox Dep. Tr. 68.

After this occurred, Cox went back to his cell, where he remained off and on for the rest of the day. While he was in his cell, Harris, Jackson, and Cabell yelled throughout the pod that Cox was a "snitch," that Miles had told them what Cox had said about them, and that they "were going to get [Cox's] ass." Id. at 71. Jackson offer $50.00 to anyone who would "beat [Cox's] ass." Id. at 72. Harris also approached Garlic and told him "that the only reason they [were not] going to beat [his] ass down was because of [his] age." Garlic Decl. 3.

Cox eventually left his cell to go to dinner. He approached Miles, who was serving the inmates' meals that evening. When asked what he told Miles, Cox testified as follows:

> I said, "Mr. Miles, why did you all talk to these guys? Why did you say anything to these guys?" I said, "Now they are threatening me, going to do something to me." I said, "I want out of here, Miles. You all got to do something."

Cox Dep. Tr. 74-75. Cox further testified that, in response to the request for assistance, Miles "just threw his hands up with the clipboard and said, 'What now, Cox?'" Id. at 75. Miles then "turned around and walked off away" from Cox. Id.; see also id. at 77 ("Like I said, Mr. Miles threw his hands up and left.").

6

Cox took his meal and sat at a table with Garlic. While they were eating, Harris stood up and yelled, "We are going to get you, snitch, we are going to get you. We are going to beat your ass before lockdown. I want everybody in the pod to know that Sheron controls this shit in here. We don't need a snitch in here. We are going to get his ass out of here one way or another." Id. at 75.

Cox left the dining area and went back to his cell. He eventually came out of his cell and stood against the tier railings to see what was going on in the pod. Cox saw Cabell and Jackson walking in his direction. As they walked by him, Jackson warned Cox that he was "going to get fucked up" before the day ended. Id. at 79.

While Cox was watching Cabell and Jackson walk away, Reddix, with whom he had never had any previous problems, approached Cox from the left side and indicated that he wanted to talk to him. As Cox was entering his cell to speak to Reddix, it dawned on him that Reddix "was kind of buddy-buddy" with Harris, Cabell, and Jackson. Id. at 80. When Cox attempted to reverse direction, Reddix punched Cox in the back of the neck and knocked him across the cell. Reddix then repeatedly punched Cox in the ribs, head, and back until another inmate yelled that correctional officers were on the way. Cox estimated that the entire attack lasted between 45 and 75 seconds.

Cox suffered broken ribs, a loosened tooth, bruising, swelling, and abrasions as a result of the incident. As he was being helped out of the pod after the attack, Cox reminded Miles and Officer Quinn that he had "told [them] something bad was going to happen." Miles Incident Report 1; Quinn Dep. Tr. 54.

7

## Procedural History

Cox filed the instant action under 42 U.S.C. § 1983 on April 1, 2012.[3] On April 11, 2013, Cox filed an amended complaint against Miles, Captain Keller, Sergeant Smith, Major Winston, Officer Quinn, Officer Baxley, and Officer Pinkerman. The amended complaint asserts the following claims: failure to protect in violation of the Eighth Amendment to the Constitution of the United States and Article I, § 9 of the Constitution of Virginia; conspiracy to violate the plaintiff's federal constitutional rights; aiding and abetting and conspiracy to commit assault and battery; and intentional infliction of emotional distress.

On February 5, 2015, Miles and the jail defendants moved for summary judgment. The court held a hearing on the motions on March 6, 2015. On March 16, 2015, the court invited the parties to submit supplemental briefs in light of the intervening decision by the United States Court of Appeals for the Fourth Circuit in Makdessi v. Fields, ___ F.3d ___, 2015 U.S. App. LEXIS 3883, 2015 WL 1062747 (4th Cir. Mar. 12, 2015). The summary judgment motions are now ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Id. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of his

---

[3] The case was originally assigned to Senior United States District Judge James C. Turk. The case was reassigned to the undersigned district judge on July 2, 2014.

8

case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting

Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).   In assessing a summary

judgment motion, a court is entitled to consider only the evidence that would be admissible at trial.

See Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991)

(noting that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for

summary judgment")

## Discussion

### I.    Claims under § 1983

Cox filed suit against the defendants pursuant to 42 U.S.C. § 1983, which imposes civil

liability on any person acting under color of state law to deprive another person of rights and

privileges secured by the Constitution and laws of the United States.   As previously stated, Cox

claims that the defendants violated his rights under the Eighth Amendment by failing to protect

him from the attack, and that they conspired to violate his federal constitutional rights.

### A.    Failure to Protect

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."[4]

U.S. Const. amend. VIII.   "In its prohibition of 'cruel and unusual punishments,' the Eighth

Amendment places restraints on prison officials, who may not, for example use excessive physical

force against prisoners."   Farmer v. Brennan, 511 U.S. 825, 832 (1994).   "The Amendment also

imposes duties on these officials . . . ."   Id.   One such duty is "to protect prisoners from violence

at the hands of other prisoners."   Id. (internal citation and quotation marks omitted).

---

[4] Because the parallel provision of the Constitution of Virginia, Article I, § 9, provides no greater protection to inmates than the cruel and unusual punishment clause of the Eighth Amendment, the court will not separately address Cox's state constitutional claim.

9

Not every injury suffered by a prisoner at the hands of another "translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834. To prevail on an Eighth Amendment claim of this nature, a prisoner must satisfy two elements. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Specifically, "a prisoner must establish a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury.'" Danser v. Stansberry, 772 F.3d 340, 346 (4th Cir. 2014) (quoting Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010)). In this case, it is undisputed that Cox's physical injuries qualify as "significant" under this first element.

The second element, on which the parties focus their arguments, requires that a plaintiff show that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. In this context, the state of mind that must be established is one of "deliberate indifference to inmate health or safety." Id. A correctional official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety." Id. at 837. "In other words, 'the test is whether the [official knows] the plaintiff inmate faces a serious danger to his safety and . . . could avert the danger easily yet . . . fail[s] to do so." Brown, 612 F.3d at 723 (internal citation and quotation marks omitted).

Deliberate indifference is "a very high standard" that cannot be met by a showing of "mere negligence." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). It is a subjective standard, Farmer, 511 U.S. at 828, which requires a plaintiff to prove that the correctional official "had actual knowledge of an excessive risk to [his] safety." Danser, 772 F.3d at 347. The correctional official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. The

10

Fourth Circuit has explained that liability under this standard requires "two showings":

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers should have recognized it; they actually must have perceived the risk. Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." Id. As with the subjective awareness element, it is not enough that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001).

Parrish v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis omitted).

Although the deliberate indifference standard requires a showing of actual knowledge as to both elements, direct evidence of actual knowledge is not required. Id.; see also Makdessi, 2015 U.S. App. LEXIS 3883, at *15. Instead, "it 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" Parrish, 372 F.3d at 303 (quoting Farmer, 511 U.S. at 842). For instance, "a plaintiff can make a prima facie case under this standard by showing 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.'" Parrish, 372 F.3d at 303 (quoting Farmer, 511 U.S. at 842). "Similarly, a fact finder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Id.

In this case, Cox claims that each of the named defendants acted with deliberate indifference to a significant risk that Cox would be seriously harmed by another inmate. The court will evaluate this claim as to each individual defendant, viewing the evidence in the light most favorable to Cox. See Odom v. S.C. Dep't of Corr., 349 F.3d 765, 771-72 (4th Cir. 2013)

11

(assessing whether the plaintiff presented evidence which, if believed, would establish that each defendant violated his constitutional rights); see also Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2001) ("In determining the substantiality of the risk that [one of the defendant correctional officers] knew, and the reasonableness of his response to it, we must consider everything that he was told and observed."); Dale v. Poston, 548 F.3d 563, 570 (7th Cir. 2008) ("Each case must be examined individually, with particular focus on what the officer knew and how he responded.").

### 1. **Major Winston**

Turning first to Major Winston, the record reveals that this defendant received an anonymous blue slip on March 8, 2011, which indicated that Sheron Harris "was a problem in Pod 3A." Pl's Br. in Opp'n to Jail Defendants' Motion for Summary Judgment 5; see also Cox Dep. 125 ("I had written a letter to Major Winston requesting that something be done about Sheron, either move him or move me, he was harassing the pod, he's harassing me."). Upon receiving the blue slip, Major Winston called Captain Keller into his office and directed Keller to investigate the matter, which Keller proceeded to do.

In his briefs in opposition to the jail defendants' summary judgment motion, Cox points to no other evidence of knowledge or action on behalf of Major Winston. He does not allege that Major Winston was aware of or involved in any subsequent events, including those leading up to the attack on April 11, 2011. On this record, the court concludes that no reasonable jury could find that Major Winston acted with deliberate indifference to Cox's safety.

### 2. **Captain Keller**

Captain Keller's only involvement in this matter occurred on March 8, 2011, when he investigated the blue slip that Cox had submitted. Captain Keller met with Cox in the jail library. During the meeting, Cox told Captain Keller that Harris was "harassing him" and other inmates in

12

Pod 3A, that he "was having things taken," and that he wanted Captain Keller to either move him or Harris. Cox Dep. Tr. 125. According to Cox, Captain Keller acknowledged that he was aware that Harris was a "loud . . . asshole," and that Harris had a history of "creat[ing] problems," which led to Harris being placed "in this particular program." Id. Captain Keller asked Cox if he and Harris could remain in the same pod if Keller talked to Harris. Cox agreed to this course of action and returned to the pod.

On this record, the court concludes that the evidence presented by Cox cannot support a finding that Captain Keller acted with deliberate indifference to Cox's safety. Even assuming that Harris had a history of causing problems in the jail, there is no evidence that would justify an inference that Captain Keller knew that Harris or any other inmate posed a substantial risk of serious harm to Cox, or that Captain Keller actually recognized that the agreed upon course of action was inappropriate under the circumstances. Moreover, while the evidence indicates that Harris's behavior worsened after Captain Keller scolded him for the manner in which he was treating other inmates, there is no indication that Captain Keller was made aware of Harris's subsequent threatening acts toward Cox, or otherwise exposed to information suggesting that Cox's safety was in danger. In the absence of such evidence, the court concludes that no reasonable jury could find that Captain Keller "actually knew of and disregarded a substantial risk of serious injury" to Cox. Parrish, 372 F.3d at 303 (emphasis omitted).

### 3.    Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley

Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley spoke to Cox and his pod mate, Jerry Garlic, on April 11, 2011, the day that Cox was attacked by Reddix. By that point, Harris had been repeatedly referring to Cox as a snitch, and both Harris and Cabell had threatened to physically harm Cox. Cox told these defendants that he was being threatened, that he feared

13

for his safety, and that he wanted to be moved out of the pod.   However, rather than removing Cox from the pod, as Sergeant Smith testified that they were instructed to do, these defendants allegedly directed Cox to return to the pod, and told him that they would talk to Harris and the other inmates about their behavior.   Although Cox warned them that this course of action would "put an X on [him]" and only "make the situation worse," Cox Dep. Tr. 65, these defendants nonetheless proceeded to speak to the inmates who had been threatening him, and told them that Cox had reported their misconduct.   Later that day, after Harris, Jackson, and Cabell yelled throughout the pod that Cox was a snitch, that they were going to harm him, and that they would pay anyone who was willing to do so, Cox approached Miles again in the dining area and pleaded for Miles to help him.   According to Cox, Miles "just threw his hands up" and left the room.   Id. at 75.   Shortly thereafter, Cox was attacked by Reddix.

Viewing the record in the light most favorable to Cox, the court concludes that a reasonable jury could find that Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley were "exposed to information concerning the risk" of serious harm that Cox faced in Pod 3A, and therefore "must have known about it." Farmer, 511 U.S. at 842.   Likewise, the evidence proffered by Cox, if credited, supports a reasonable inference that these defendants knowingly disregarded that risk by failing to remove Cox from the pod after he reported being threatened, and proceeding to tell the inmates who had voiced the threats that Cox had reported their misconduct.   In other words, a reasonable jury could find that these defendants knew that Cox faced a serious danger to his safety, and that they could have easily averted the danger yet failed to do so.   See Brown, 612 F.3d at 723.

In moving for summary judgment, these defendants argue that Cox made no mention of Reddix when he requested their assistance on April 11, 2011, and, thus, that they could not have

14

known that Reddix posed a threat to Cox. This argument, however, is foreclosed by existing precedent. As the Fourth Circuit recently observed, "<u>Farmer</u> makes clear that 'a prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.'" <u>Makdessi</u>, 2015 U.S. App. LEXIS 3883, at *20 (quoting <u>Farmer</u>, 511 U.S. at 843); <u>see also</u> <u>Glaze v. Byrd</u>, 721 F.3d 528, 531 (8th Cir. 2013) ("Insofar as Childs relies on Boyce's failure to identify the would-be assailant, his argument has been rejected by the Supreme Court.").

Miles also argues that "it is impossible for a jury to conclude that [he] was deliberately indifferent to Plaintiff's safety," since he, as a non-certified correctional officer, "had no authority to do what Plaintiff claims would have kept him safe – that is move Plaintiff or the other inmates out of the pod." Miles' Br. in Supp. of Summ. J. 19. However, even assuming that Miles lacked authority to move an inmate to a different housing unit, this would not absolve him from liability if he knew that maintaining the current housing arrangement posed a substantial risk of serious harm to Cox, but did nothing to ameliorate the risk. <u>See</u> <u>Makdessi</u>, 2015 U.S. App. LEXIS 3883, at *21 (citing <u>Farmer</u>, 511 U.S. at 842). Viewing the evidence in the light most favorable to Cox, a reasonable jury could find that Miles did just that, after Cox approached him in the dining hall on the night of the attack and pleaded for help. According to Cox's deposition testimony, Cox told Miles that Harris and other inmates were threatening him for snitching on them, that the inmates were going to harm him, and that he needed Miles and the other officers to "do something" to help him. Cox Dep. Tr. 74-75. In response, Miles simply threw his hands up in the air and left the room. There is no evidence that Miles relayed Cox's concerns to a supervisor, as Miles claims would have been his only duty under the circumstances as a non-certified correctional officer, or

15

that Miles took any other steps to investigate the matter or assist Cox.   Based on this record, the mere fact that Miles may have lacked authority to reassign inmates does not entitle him to summary judgment.

Finally, Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley argue that they are entitled to qualified immunity.   The defense of qualified immunity "protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."   Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)).   "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense."   Meyers v. Baltimore Cnty., 713 F.3d 723, 731 (4th Cir. 2013).   To prevail under this defense, the defendants have to "show either that there was no constitutional violation or that the right violated was not clearly established."   Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012) (citing Henry, 652 F.3d at 531).

In this case, the court has already determined that the evidence cited by Cox, when viewed in his favor, is sufficient to create a genuine dispute of fact as to whether Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley acted with deliberate indifference to a substantial risk of serious harm to Cox.   Consequently, the court must decide whether the constitutional right at issue was clearly established.   In determining whether a right was clearly established, the key inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   Saucier, 533 U.S. at 202.

At the time of Cox's detention in April of 2011, it was clearly established that correctional officials have a duty "to protect prisoners from violence at the hands of other prisoners," Farmer, 511 U.S. at 833, and that an official may be held liable if he knows of and disregards an

16

excessive risk to an inmate's health or safety.  Id. at 837.  In the instant case, the record contains

evidence that, when viewed in Cox's favor, suggests that Miles, Officer Quinn, Officer

Pinkerman, and Officer Baxley were aware of and disregarded the substantial risk of serious harm

that Cox faced in Pod 3A.  Accepting Cox's version of the events, the court is unable to conclude

that these defendants could have reasonably believed that their conduct was lawful.  Accordingly,

Miles, Officer Quinn, Officer Pinkerman, and Officer Baxley are not entitled to qualified

immunity, and the motions for summary judgment must be denied with respect to the plaintiff's

constitutional claim against these defendants.

### 4.    Sergeant Smith

The final defendant named in the amended complaint is Sergeant Smith.  Sergeant

Smith's only involvement in this matter occurred on April 11, 2011, when Miles called him to

advise him of the situation in Pod 3A involving Cox.  There is some dispute as to Sergeant

Smith's exact response.  While Smith testified at his deposition that he gave the officers explicit

instructions on how to handle the situation if Cox was being threatened, Miles testified that Smith

told him to have the certified correctional officers with whom he was working handle the

situation.[5]  Ultimately, however, this dispute is not material to the resolution of Cox's claim

against Sergeant Smith.  The evidence submitted by Cox indicates that the correctional officers

on duty in the pod are ordinarily responsible for responding to an inmate's safety concerns.  See

---

[5] In his brief in opposition to the jail defendants' motion, Cox argues that "there is evidence that, despite [his] complaints, Defendant Smith expressly told the correctional officers that they could not move Mr. Cox." Cox's Br. in Opp'n 21.  However, the only evidence the Cox cites to support this assertion -- Cox's testimony that Miles and other defendants told him that Smith told them not move him -- is inadmissible hearsay under Rules 801 and 802 of the Federal Rules of Evidence and, thus, cannot be considered on summary judgment. See, e.g., Glaze, 721 F.3d at 533 ("The second statement -- Childs's report that Andrews said 'he couldn't do anything about it'-- is also inadmissible.  This statement is hearsay within hearsay.  Boyce testified about a statement by Childs that reported a statement by Andrews.  This type of evidence is admissible only 'if each part of the combined statements conforms with an exception to the rule [against hearsay].'  Fed. R. Evid. 805. Although Andrews's statement would be admissible against him as an admission if Childs so testified, there is no exception allowing admission of Boyce's statement about what Childs told him.").

17

Winston Dep. 29.  Thus, even assuming that Sergeant Smith simply advised Miles to have the certified correctional officers handle the situation with Cox, no reasonable jury could find from such evidence that Sergeant Smith knowingly disregarded an excessive risk of harm.  Likewise, no reasonable jury could find that Smith is subject to supervisory liability for any constitutional injuries inflicted by his subordinates.  See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth requirements for establishing supervisory liability).  Accordingly, the jail defendants' motion will be granted as to Cox's constitutional claim against Sergeant Smith.

**B.**    **Conspiracy**

Cox also seeks to hold the defendants liable under § 1983 for conspiring to violate his federal constitutional rights.  To establish a civil conspiracy under § 1983, the plaintiff "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right."  Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).  This is a "weighty burden."  Id.  While the plaintiff "need not produce direct evidence of a meeting of the minds," he "must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective."  Id.  In other words, to survive summary judgment, the plaintiff's evidence "must, at least, reasonably lead to the inference that the [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan."  Id.

Upon review of the record, the court is convinced that Cox has failed to proffer evidence from which a reasonable jury could find that that such a mutual understanding was reached in this case.  Accordingly, the defendants' motions for summary judgment will be granted with respect to Cox's claim.

## II.     Claims under state law

In addition to his claims under § 1983, Cox asserts supplemental state law claims of conspiracy to commit assault and battery and intentional infliction of emotional distress.[6]

### A.     Conspiracy to commit assault and battery

Cox first asserts a claim for conspiracy to commit assault and battery.    Such claim has not been recognized by the Supreme Court of Virginia, and lower courts "have yet to conclusively decide the matter."    Fuller v. Aliff, 990 F. Supp. 2d 576, 582 (E.D. Va. 2013) (citing cases). Even assuming that conspiracy to commit assault and battery is a viable cause of action, the court concludes that the defendants are entitled to summary judgment in the instant case.    Simply stated, Cox has failed proffer evidence from which a reasonable jury could find that the defendants "combined to accomplish, by some concerted action," the torts of assault and battery. Commercial Business Sys., Inc. v. BellSouth Services, Inc., 453 S.E.2d 261, 267 (Va. 1995). Accordingly, the defendants' motions will be granted with respect to this claim.

### B.     Intentional infliction of emotional distress

Cox's final claim is one for intentional infliction of emotional distress.    Such claims are not favored in Virginia.    See SuperValu, Inc. v. Johnson, 666 S.E.2d 335, 370 (Va. 2008).    To prevail on a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements by clear and convincing evidence: (1) that "the wrongdoer's conduct was intentional or reckless"; (2) that "the conduct was outrageous or intolerable"; (3) that "there was a causal connection between the wrongdoer's conduct and the resulting emotional distress"; and (4) that "the resulting emotional distress was severe."    Id.

---

[6] Cox also claimed that the defendants aided and abetted the commission of an assault and battery. However, he withdrew that claim in his initial brief in opposition to the pending motions.

19

Assuming, without deciding, that a reasonable jury could find that Cox satisfied the first three elements with respect to any one of the defendants, the court concludes that Cox's claim for intentional infliction of emotional distress is insufficient to withstand summary judgment, since he has failed to proffer sufficient evidence that he has suffered the degree of emotional distress required to meet the fourth element. With respect to that element, the Supreme Court of Virginia has emphasized that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." Russo v. White, 400 S.E.2d 160, 163 (Va. 1991).

In Russo, the Supreme Court held that a plaintiff complaining of nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and an inability to concentrate at work, failed to allege the type of extreme emotional distress that gives rise to liability. Id. Applying Russo in Harris v. Kreutzer, 624 S.E.2d 24 (Va. 2006), the Supreme Court likewise held that the plaintiff's allegations of "severe psychological trauma and mental anguish affecting her mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," were "insufficient to satisfy the fourth element" of the test for intentional infliction of emotional distress. Harris, 624 S.E.2d at 34.

More recently, in Almy v. Grisham, 639 S.E.2d 182 (Va. 2007), the Supreme Court found that the plaintiff had adequately alleged severe emotional distress where she asserted that the defendants' conduct "caused her to suffer from several debilitating conditions, including depression, nervousness, and an inability to sleep, which ultimately caused a complete disintegration of virtually every aspect of her life." Almy, 639 S.E.2d at 188. In distinguishing

20

cases such as <u>Russo</u> and <u>Harris</u>, the Supreme Court noted that "[w]hile both Almy and the plaintiff in <u>Harris</u> alleged that they required counseling and suffered from severe psychological trauma, depression, humiliation and injury to reputation, Almy additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities." <u>Id.</u> The Supreme Court further emphasized that, "[a]ccording to Almy, her emotional distress reached such a level of severity that '[e]very aspect of [her] life [was] fundamentally and severely altered,' such that she 'had trouble even walking out of the front door.'" <u>Id.</u> (alterations in original).

Applying the foregoing decisions, the court concludes that Cox has failed to proffer sufficient evidence to establish that he suffered the degree of emotional distress required to succeed on this claim. During his deposition, Cox testified that he had "occasional bad dreams about [the attack]," and that he became "nervous around people in conversations." Cox Dep. Tr. 100. While Cox also testified that he took Paxil to help with anxiety, his medical records confirm that this medication was prescribed the year before the incident in question. <u>See</u> Pl.'s Ex. 8; <u>see also</u> Cox Dep. Tr. 100 ("I was on some Paxil drug or something. I am not exactly for sure if I was taking that before or after this incident . . . . But outside of that, no, I haven't taken anything. Don't take anything."). When asked if he experienced any symptoms other than nervousness and occasional bad dreams, Cox testified that he was not aware of any additional problems, and that he had not seen a doctor since he was released from jail. On this record, the court is convinced that the evidence proffered by Jackson would not allow a reasonable jury to find that he experienced emotional distress "so severe that no reasonable person could be expected to endure it." <u>Russo</u>, 400 S.E.2d at 163. Accordingly, the court will grant the defendants' motions for summary judgment with respect to this claim.

21

## III.    **Punitive Damages**

The defendants have also moved for summary judgment on the plaintiff's claim for

punitive damages.   Punitive damages are "available in § 1983 actions for conduct that involves

'reckless or callous indifference to the federally protected rights of others,' as well as for conduct

motivated by evil intent."   Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987) (quoting Smith v.

Wade, 461 U.S. 30, 56 (1983)).   At this stage of the proceedings, the court is of the opinion that

the evidence in the summary judgment record, when viewed in Cox's favor, is sufficient to create

a triable issue as to whether Miles, Officer Quinn, Officer Baxley, and Officer Pinkerman acted

with reckless disregard for Cox's rights under the Eighth Amendment.   Accordingly, these

defendants are not entitled to summary judgment as to punitive damages.

## **Conclusion**

For the reasons stated, the defendants' motions for summary judgment will be granted in

part and denied in part, and the case will proceed to trial on Cox's constitutional claim

against Miles, Officer Quinn, Officer Baxley, and Officer Pinkerman.

The Clerk is directed to send copies of this memorandum opinion and the accompanying

order to all counsel of record.

ENTER: This **3rd** day of June, 2015.

_____
Chief United States District Judge

22