<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 15-6943**

———————————

DEWAYNE JACKSON COX, a/k/a Dwayne Cox,

        Plaintiff – Appellee,

    v.

OFFICER BRADLEY QUINN; OFFICER JOSHUA PINKERMAN; OFFICER BENJAMIN BAXLEY,

        Defendants – Appellants,

    and

CAPTAIN CHAD KELLER; SERGEANT WILLIE SMITH; MAJOR GREG WINSTON; LIEUTENANT SHELTON; CORRECTIONAL OFFICER MYLES, a/k/a Miles; OTHER UNKNOWN OFFICERS AND/OR EMPLOYEES OF THE WESTERN VIRGINIA REGIONAL JAIL; BRANDON JAMAL REDDIX; JUSTIN MILES,

        Defendants.

———————————

**No. 15-6944**

———————————

DEWAYNE JACKSON COX, a/k/a Dwayne Cox,

        Plaintiff – Appellee,

    v.

JUSTIN MILES,

        Defendant – Appellant,

    and

OFFICER BRADLEY QUINN; OFFICER JOSHUA PINKERMAN; OFFICER
BENJAMIN BAXLEY; CAPTAIN CHAD KELLER; SERGEANT WILLIE SMITH;
MAJOR GREG WINSTON; LIEUTENANT SHELTON; CORRECTIONAL OFFICER
MYLES, a/k/a Miles; OTHER UNKNOWN OFFICERS AND/OR EMPLOYEES
OF THE WESTERN VIRGINIA REGIONAL JAIL; BRANDON JAMAL REDDIX,

                    Defendants.

                    _____

Appeals from the United States District Court for the Western
District of Virginia, at Roanoke.   Glen E. Conrad, Chief
District Judge.  (7:12-cv-00154-GEC)

                    _____

Argued: May 11, 2016                    Decided:  July 6, 2016

                    _____

Before DUNCAN, WYNN, and HARRIS, Circuit Judges.

                    _____

Affirmed by published opinion.   Judge Harris wrote the opinion,
in which Judge Duncan and Judge Wynn joined.

                    _____

**ARGUED:** Jim H. Guynn, Jr., GUYNN & WADDELL, P.C., Salem,
Virginia; Christopher Carey Newton, FRITH ANDERSON & PEAKE,
P.C., Roanoke, Virginia, for Appellants.   Melvin Edward
Williams, MEL WILLIAMS PLC, Roanoke, Virginia, for Appellee. **ON
BRIEF:** John C. Johnson, FRITH ANDERSON & PEAKE, P.C., Roanoke,
Virginia, for Appellant Justin Miles.

                    _____

PAMELA HARRIS, Circuit Judge:

In 2011, appellee Dewayne Cox was severely beaten by a fellow inmate while incarcerated at the Western Virginia Regional Jail. Cox had repeatedly complained to jail officials — including the appellants, correctional officers Bradley Quinn, Joshua Pinkerman, Benjamin Baxley, and Justin Miles — that he was being threatened, harassed, and robbed by the group of inmates who ultimately orchestrated the beating. Cox filed suit against Baxley, Quinn, Pinkerman, and Miles, alleging that they had been deliberately indifferent to a substantial risk to his safety, in violation of 42 U.S.C. § 1983 and the Eighth Amendment. The district court denied summary judgment to the correctional officers, finding that they were not entitled to qualified immunity on Cox's claims. We agree, and we affirm.

## I.

### A.

Because this is an interlocutory appeal of a denial of qualified immunity, we consider only "the facts as the district court viewed them as well as any additional undisputed facts." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014).

In 2010 and 2011, Dewayne Cox was incarcerated at the Western Virginia Regional Jail. Cox was housed in "Pod 3A" with

3

about fifty other men, including Terrence Jackson, David Cabell, Sheron Harris, and Brandon Reddix. Jackson, Cabell, and Harris formed an informal gang or group in the pod. At some point, Reddix joined their group as well.

Cox and other inmates found the Jackson-Cabell-Harris group to be loud, aggressive, intimidating, and threatening. As one inmate, Gerald Garlic, explained,

> They would snatch the T.V. remote from others['] hands, and take radio[]s or unplug headphones, and disrupt board games or card games by pushing them out of reach or taking p[ie]ces and issuing a challenge to who-ever they chose to pick on at the time by saying things like "what ya gonna do pops" "say something" "I'll fuck you up" ["]we rule this pod and if y[']all don't like it just say something and we'll take care of you" or "say something to the [correctional officers] we will beat your old toothless stinking ass to death," or ["]we are []Bloods and we run shit in here."

J.A. 317–18. According to another inmate, Joe Rutherford, "Harris[,] Cabell and Jackson [were] constantly loud and intimidating and more or less [were] in a gang all their own. They were trouble waiting to happen." J.A. 324.

Cox and at least one other inmate submitted informal complaints, or "blue slips," describing the group's aggressive and threatening behavior to jail officials, and Cox discussed his concerns with Captain Chad Keller on March 8, 2011. Cox informed Keller that Harris was harassing and stealing from him and requested that either he or Harris be moved to a different

pod.  According to Cox, Keller responded that he knew Harris was "an asshole" who "creates problems everywhere he goes."  J.A. 282.  But Keller asked Cox if he and Harris could remain in the pod together if he talked to Harris and "ke[pt] him on a chain." Id.  Cox agreed.

After Keller talked to Harris about Cox's complaints, however, the situation in the pod only got worse for Cox. Harris called Cox a "snitch" and threatened that he "was going to get" him.  J.A. 283.  Then, a few weeks later, Harris and Cabell instigated a physical altercation with Cox and issued explicit threats in front of other inmates.  As one inmate described:

> [T]here were about six of us playing poker together. . . . Dewayne [Cox] won a hand.  Harris and Cabell started raising their voices, telling Dewayne he was a p[ie]ce of shit.  Mr. Cabell jerked the sheet we had covering the table[] off the table and threw cards everywhere.  He reached across the table and knocked other cards . . . out of Dewayne's hands and got in Dewayne[']s face and said "Do something punk,[] say anything you old toothless son of a bitch and I'll stomp your white ass all over this pod."  Then Cabell went to the telephone area, still angry, upset, and threw a blue plastic chair . . . across the floor, and issued a challenge for the whole pod, for "anybody say one fucking word about it I will fuck em up" "Go on! Anybody, please say something so I can beat some ass."

J.A. 324-25 (affidavit of inmate Rutherford).  In addition, Harris and Cabell stole commissary items from Cox and harassed him on other occasions.  Cox submitted several more blue slips complaining about these issues and requesting that either he or

5

Case 7:12-cv-00154-GEC   Document 70   Filed 07/06/16   Page 5 of 22   Pageid#: 872

pod.  According to Cox, Keller responded that he knew Harris was "an asshole" who "creates problems everywhere he goes."  J.A. 282.  But Keller asked Cox if he and Harris could remain in the pod together if he talked to Harris and "ke[pt] him on a chain." Id.  Cox agreed.

After Keller talked to Harris about Cox's complaints, however, the situation in the pod only got worse for Cox. Harris called Cox a "snitch" and threatened that he "was going to get" him.  J.A. 283.  Then, a few weeks later, Harris and Cabell instigated a physical altercation with Cox and issued explicit threats in front of other inmates.  As one inmate described:

> [T]here were about six of us playing poker together. . . . Dewayne [Cox] won a hand.  Harris and Cabell started raising their voices, telling Dewayne he was a p[ie]ce of shit.  Mr. Cabell jerked the sheet we had covering the table[] off the table and threw cards everywhere.  He reached across the table and knocked other cards . . . out of Dewayne's hands and got in Dewayne[']s face and said "Do something punk,[] say anything you old toothless son of a bitch and I'll stomp your white ass all over this pod."  Then Cabell went to the telephone area, still angry, upset, and threw a blue plastic chair . . . across the floor, and issued a challenge for the whole pod, for "anybody say one fucking word about it I will fuck em up" "Go on! Anybody, please say something so I can beat some ass."

J.A. 324-25 (affidavit of inmate Rutherford).  In addition, Harris and Cabell stole commissary items from Cox and harassed him on other occasions.  Cox submitted several more blue slips complaining about these issues and requesting that either he or

5

the inmates who were threatening him be moved to a different pod. He never received any response.

Appellants Quinn, Baxley, and Pinkerman were certified correctional officers at the jail, and appellant Miles was an uncertified officer — essentially, a trainee. On April 11, 2011, Quinn, Baxley, and Miles were on duty in Pod 3A, and Pinkerman was working nearby. Cox approached Miles that morning and asked "what they were going to do about what was going on in the pod . . . with Cabell and Jackson and Harris." J.A. 218. He also inquired about the number of blue slips that jail officials had received about those inmates. Miles stated that he was aware of blue slips from Cox and one other inmate, and he asked Cox to step out into the hallway to discuss his concerns further.

Cox, along with inmate Garlic, went into the hall to talk further with Miles. They explained that they "were being harassed" and that Cabell and Harris were stealing from Cox. J.A. 219. Cox told Miles that he feared for his safety, and both Cox and Garlic requested that either they or the problematic inmates be moved out of the pod.

Officers Quinn, Baxley, and Pinkerman eventually joined the conversation and Cox repeated his concerns to them. Miles assured Cox and Garlic that they would "take care of it," and the other officers agreed. J.A. 221. Cox asked the officers

6

what they planned to do, saying "[s]omebody needs to be moved, somebody is going to get hurt." Id. Miles stated that they would "talk to the guys," and Cox responded: "Don't do that because that will put an X on me and make the situation worse than what it is." J.A. 222. Garlic agreed with Cox, expressing concern that if the officers spoke to the inmates, "they would only get angry and retaliate against us." J.A. 319. And both Cox and Garlic again requested to either be moved from the pod or to have the other inmates moved. The officers instructed Cox and Garlic to return to the pod.

After speaking with Cox and Garlic, Miles reached out to Sergeant Willie Smith for advice. According to Miles, Smith responded that he was "busy" and that Miles needed to "get [his] guys to handle it." J.A. 102. But according to Smith himself, he told the officers, "[I]f Cox is being threatened in any way or if anybody is being threatened, remove them out of the pod, lock the inmates down, lock the whole pod and question all of the inmates in the pod to find out what was going on." J.A. 343.

When Cox returned to the pod, he called a friend on the telephone in the pod's common area and spoke to her for several minutes. While Cox was on the telephone, inmates began to return to the pod from the recreation area. Cox noticed that Cabell, Jackson, and Harris — who had been at recreation — did

7

not reenter the pod with the others. Then, about five minutes later, the three men returned to the pod. Right away, Harris "hollered at" Cox, loudly yelling, "You are a fucking snitch and we are going to get your ass." J.A. 225. Cox returned to his cell, but he continued to hear Harris, as well as Jackson and Cabell, yelling, "Miles told us what you said, that you told on us," that Cox was a "snitch," and that they were "going to get" him. J.A. 228. Cox also heard Jackson shout that he was offering fifty dollars "for somebody to beat [Cox's] ass." J.A. 229.

Later that day, Cox left his cell for dinner and approached Miles, who was serving the inmates' meal. Cox said:

> Mr. Miles, why did you all talk to these guys? Why did you say anything to these guys? . . . Now they are threatening me, going to do something to me. . . . I want out of here, Miles. You all got to do something.

J.A. 231–32. According to Cox, Miles responded by throwing up his hands, saying, "What now, Cox?" and then turning around and walking away. J.A. 232.

Cox sat down with Garlic to eat, and Harris stood up and yelled, "We are going to get you, snitch, we are going to get you. We are going to beat your ass before lockdown." J.A. 232. Cox returned to his cell without finishing his dinner. He later came out of his cell and saw Cabell and Jackson walk by. Cabell

8

warned that Cox was "going to get fucked up" before the end of the day. J.A. 236.

At that point, Brandon Reddix approached Cox and said, "I want to talk to you, man." J.A. 237. Cox had not previously had any problems with Reddix and he started through his own cell door to talk with Reddix there, but then he realized that Reddix "was kind of buddy-buddy" with Harris, Cabell, and Jackson. Id. Cox started to reverse course, but Reddix punched him in the back of his neck and knocked him across the cell. Reddix continued to beat Cox on his head, ribs, and back until another inmate yelled that correctional officers were on the way. Cox estimates that the assault lasted between 45 and 75 seconds, and he suffered broken ribs, a loosened tooth, bruising, swelling, and abrasions.

Miles later discovered Cox bloodied and injured from Reddix's attack. Cox reminded Miles, as well as Officer Quinn, that he had warned them something bad was going to happen to him.

Miles filed an incident report recommending that Cabell, Harris, and Jackson be given "Major Violations" for assault. According to Miles, even though none of those three inmates actually attacked Cox, "they were a little group in that pod and they were . . . notorious." J.A. 147-48. Miles believed that "they needed to be cited for planning" the attack on Cox. J.A.

9

148.   Sergeant Smith concurred with this recommendation in a separate report.

## B.

In 2012, Cox filed suit against Quinn, Baxley, Pinkerman, and Miles under 42 U.S.C. § 1983.[1]   Relevant here, Cox alleged that the correctional officers had violated his Eighth Amendment right to "protect[ion] from violence at the hands of other prisoners," which flows from the Amendment's prohibition on "cruel and unusual punishments."   See Farmer v. Brennan, 511 U.S. 825, 832–33 (1994); U.S. Const. amend. VIII.

The correctional officers moved for summary judgment.   They argued that they had not violated Cox's Eighth Amendment rights because they were not "deliberately indifferent" to a substantial risk that Cox would be assaulted by a fellow inmate. See Farmer, 511 U.S. at 834 (element of Eighth Amendment violation is that defendant prison officials acted with "'deliberate indifference' to inmate health or safety" (citation omitted)).   They also argued that they were entitled to qualified immunity because reasonable correctional officers in the same circumstances would not have known that they had violated Cox's clearly established rights.   See Parrish ex rel.

---

[1] Cox's original and amended complaints also named other defendants and included other claims, but those defendants and claims are not pertinent to this appeal.

<u>Lee v. Cleveland</u>, 372 F.3d 294, 301 (4th Cir. 2004) (element of qualified immunity analysis is that the right in question "was 'clearly established' at the time of the alleged offense" (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001))).

Viewing the record in the light most favorable to Cox, the district court determined that there was a genuine issue of material fact in dispute as to whether the correctional officers had acted with deliberate indifference to a substantial threat to Cox's safety. <u>See</u> <u>Farmer</u>, 511 U.S. at 834. The court further found that the officers were not entitled to qualified immunity because the duty of jail officials to protect prisoners from inmate violence was clearly established in April of 2011. Accordingly, the court denied summary judgment to the appellants.

Quinn, Baxley, and Pinkerman filed one interlocutory appeal of the district court's denial of qualified immunity, and Miles filed another. We consolidated the two appeals, which we consider below.

## II.

Under the collateral order doctrine, we have jurisdiction to review a denial of qualified immunity at summary judgment only "to the extent that the court's decision turned on an issue of law." <u>Danser</u>, 772 F.3d at 344; <u>see</u> <u>Iko v. Shreve</u>, 535 F.3d

11

225, 234 (4th Cir. 2008) (noting this exception to the rule that "interlocutory appeals are generally disallowed"). Thus, we may consider only "the facts as the district court viewed them as well as any additional undisputed facts," and our review is limited to the legal question of whether the court correctly denied summary judgment on those facts. Danser, 772 F.3d at 345.

We review the district court's denial of qualified immunity at summary judgment de novo, viewing the facts in the light most favorable to Cox, the non-moving party. Id. We may grant summary judgment to the correctional officers only if "no material facts are disputed and [they are] entitled to judgment as a matter of law." See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)).

## A.

At the first step of the qualified immunity inquiry, we must determine whether, viewing the facts in the light most favorable to Cox, the correctional officers' conduct violated a constitutional right. See Parrish, 372 F.3d at 301. The correctional officers contend that the undisputed facts show that they were not, as a matter of law, deliberately indifferent to a serious risk of harm to Cox, in violation of the Eighth Amendment. See Farmer, 511 U.S. at 834. We disagree.

12

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." Id. at 832 (citation omitted); accord Makdessi v. Fields, 789 F.3d 126, 132 (4th Cir. 2015). And they have a specific "duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (alteration in original) (citation omitted). But a prison official will not be liable for failing to protect a prisoner from inmate violence unless two requirements are met. See id. at 834.

"First, the deprivation alleged must be, objectively, sufficiently serious." Id. (citation and internal quotation marks omitted); see Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010) ("[A] prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions." (quoting Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003))). In this case, the parties do not dispute that Cox's injuries meet this standard.

Second, and central to this appeal, the defendant prison officials must have had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (citation omitted). "In prison-conditions cases" like this one, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. (citation omitted). "Deliberate indifference" requires "'more

than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" <u>Makdessi</u>, 789 F.3d at 133 (alteration in original) (quoting <u>Farmer</u>, 511 U.S. at 835). It is a subjective standard requiring that a prison official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." <u>Farmer</u>, 511 U.S. at 837. And, in addition to subjectively recognizing that substantial risk, the prison official must also subjectively be aware that "his actions were 'inappropriate in light of that risk.'" <u>Parrish</u>, 372 F.3d at 303 (quoting <u>Rich v. Bruce</u>, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

Whether a prison official acted with "deliberate indifference" is a question of fact that can be proven through direct or circumstantial evidence. <u>Makdessi</u>, 789 F.3d at 133; <u>Parrish</u>, 372 F.3d at 303. A plaintiff can make a prima facie case of deliberate indifference "by showing 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.'" <u>Parrish</u>, 372 F.3d at 303 (alteration in original) (quoting <u>Farmer</u>, 511 U.S. at 842). And a prison official may not avoid liability simply because he was

14

unaware that the inmate was "especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843.

Furthermore, a prison official's response to a known threat to inmate safety must be reasonable. See id. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." (emphasis added)). Prison officials are deliberately indifferent if they are aware that "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." Brown, 612 F.3d at 723 (quoting Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002)). And "a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Parrish, 372 F.3d at 303.

### 2.

In light of the facts as we may view them, and drawing reasonable inferences in Cox's favor, we find that the district court correctly held that material issues of fact precluded summary judgment for the correctional officers on the Eighth Amendment deliberate indifference claim.

15

First, there is ample evidence suggesting that Quinn, Pinkerman, Baxley, and Miles were subjectively "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[ew] the inference," Farmer, 511 U.S. at 837:  Cox submitted numerous "blue slips" complaining that he was being threatened and robbed by Harris, Cabell, and possibly others; Cox repeatedly informed the appellants that he feared for his safety and wished either to be moved from the pod or to have the other inmates moved; and Cox expressly requested that the correctional officers not discuss his concerns with Harris and the others because he feared that would put him at even greater risk.  Moreover, Cox renewed his plea for help to Miles only a short time before the beating actually occurred.  A reasonable jury could thus conclude that the appellants "had been exposed to information concerning the risk" to Cox's safety and therefore "must have known about it." See id. at 842 (internal quotation marks omitted).

Furthermore, a reasonable jury could also decide that the correctional officers knew Cox "face[d] a serious danger to his safety" and could have "avert[ed] the danger easily" but "fail[ed] to do so."  See Brown, 612 F.3d at 723 (citation omitted).  Sergeant Smith testified at deposition that he specifically told the appellants to remove Cox from the pod and lock it down if Cox feared for his safety.  But instead of

16

taking this — or another — reasonable action to protect Cox, the officers opted to do the very thing Cox warned them would lead to disaster: They directly confronted the inmates who were threatening Cox.

The correctional officers contend that the fact that they took any action at all means that they were not deliberately indifferent as a matter of law. But the Eighth Amendment requires more than some action: It requires reasonable action. See Farmer, 511 U.S. at 844. Viewing the facts in the light most favorable to Cox, a jury could conclude that the appellants' response to Cox's concerns — seeking, but disregarding, Sergeant Smith's advice, and taking the one action Cox specifically warned would put him at greater risk — was not only unreasonable, but "so patently inadequate as to justify an inference that the official[s] actually recognized that [their] response to the risk was inappropriate under the circumstances."[2] See Parrish, 372 F.3d at 303.

The appellants also argue that there is no evidence they ever drew the inference that Cox faced a substantial risk of serious harm, see Farmer, 511 U.S. at 837, because, they say,

---

[2] And Miles's relative inexperience does nothing to alter this analysis; indeed, we are hard-pressed to imagine a more inappropriate response than throwing up one's hands and walking away when informed that an attack on an inmate is imminent.

when they addressed Cox's concerns with the inmates who had threatened him, the inmates assured the officers there would be no trouble.  But we do not have jurisdiction to consider this argument because it is based on facts that the district court did not consider and that remain in dispute.[3]  See Danser, 772 F.3d at 345.

Accordingly, we affirm the district court's denial of summary judgment on the constitutional violation prong of the qualified immunity inquiry.

### B.

Even if a correctional officer has violated a prisoner's constitutional right, however, he is shielded from liability by qualified immunity if an objectively reasonable officer could have believed that his actions were lawful "in light of clearly established law."[4]  Henry, 652 F.3d at 531.  A right is "clearly

---

[3] Furthermore, by the correctional officers' own account, Harris and Cabell's response to their inquiry was, "We will stay to ourselves if they stay to the[m]selves," J.A. 374 — hardly an ironclad assurance.  A reasonable jury crediting the correctional officers' account of this conversation might still conclude that they were subjectively aware that Cox remained in danger.

[4] Although we need not reach the issue here, we note that some courts have concluded that it is not necessary to consider the objective reasonableness prong of the qualified immunity inquiry at all when summary judgment is denied on deliberate indifference.  See, e.g., Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002); Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).  Prison officials violate the Eighth

established" if "[t]he contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 534 (alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In conducting this inquiry, we must define the right "in light of the specific context of the case, not as a broad general proposition." Parrish, 372 F.3d at 301 (quoting Saucier, 533 U.S. at 201). It is not necessary, however, that "the exact conduct at issue" have been previously held unlawful;

---

Amendment through deliberate indifference if they are aware of a substantial risk of serious harm to an inmate, Farmer, 511 U.S. at 837, yet disregard that risk by taking action that they know to be inappropriate, Parrish, 372 F.3d at 303. In other words, for purposes of deliberate indifference, the Eighth Amendment violation must have been committed knowingly. As we have noted in the past, "applying an objective qualified immunity standard in the context of an Eighth Amendment claim that is satisfied only by a showing of deliberate indifference" — that is, a knowing violation of the law — presents a "special problem." Rish v. Johnson, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997). Accordingly, some of our sister circuits have concluded that deliberately indifferent conduct can never be objectively reasonable for purposes of qualified immunity. See Walker, 293 F.3d at 1037 (holding that deliberate indifference and qualified immunity inquiries "effectively collapse into one" and that "[i]f there are genuine issues of fact concerning" a defendant's deliberate indifference, the "defendant may not avoid trial on the grounds of qualified immunity"); Beers-Capitol, 256 F.3d at 142 n.15 ("Conduct that is deliberately indifferent to an excessive risk to [juvenile detention center] residents cannot be objectively reasonable conduct."). But see Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049–50 (9th Cir. 2002) (rejecting approach that "collapses the deliberate indifference part of the constitutional inquiry into the qualified immunity inquiry").

"[r]ather, our analysis must take into consideration 'not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.'" Odom, 349 F.3d at 773 (quoting Amaechi v. West, 237 F.3d 356, 362–63 (4th Cir. 2001)).

The correctional officers contend that the district court erred in denying them qualified immunity because it was not clearly established at the time of the assault on Cox that "interceding and discussing" Cox's concerns "with the allegedly threatening prisoners violated Cox's constitutional rights." Appellants' Br. at 9. They argue that they "received assurances that there would be no trouble" from the inmates, id. at 12, and that they had no reason to believe that accepting those assurances would be unreasonable in light of clearly established law. But, again, we lack jurisdiction to consider this argument because it is premised on facts about the officers' conversation with the inmates that the district court did not consider and that remain in dispute. See Danser, 772 F.3d at 345.

On the record as we may view it here, we find that the district court correctly concluded that the correctional officers were not entitled to qualified immunity. It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners. See Farmer, 511 U.S. at 833.

20

Moreover, by 2011, we had made it clear that "a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention." Odom, 349 F.3d at 773.

Here, Cox repeatedly informed the appellants that he was being threatened and robbed and that he feared for his safety, and his concerns were corroborated by other inmates. But the only action the correctional officers took in response to this information — despite the instructions of their sergeant — was to do the one thing Cox specifically warned them would increase the risk to his safety. And when confronted with Cox's concerns again, Miles just threw up his hands and walked away. Under the law of this Circuit, an objectively reasonable correctional officer — certified or uncertified — would have known that these actions were unreasonable, ran afoul of clearly established law, and violated rights "manifestly included within more general applications of the core constitutional principle" articulated in Farmer. See Odom, 349 F.3d at 773 (citation omitted). Accordingly, the correctional officers are not entitled to qualified immunity.

**III.**

For the foregoing reasons, we affirm the district court's denial of qualified immunity to the appellants.

<u>AFFIRMED</u>